Douglas J. Serdahely
Patton Boggs LLP
601 West Fifth Avenue, Suite 700
Anchorage, AK 99501
(907) 263-6300 Phone
(907) 263-6345 Fax
E-mail: dserdahely@pattonboggs.com

Attorneys for Defendant Exxon Shipping Company

John F. Clough, III
P.O. Box 211187
Auke Bay, AK 99821
(907) 790-1912 Phone
(907) 790-1913 Fax
E-mail: cloughpc@alaska.net

Attorneys for Defendant Exxon Corporation

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>  v.<br><br>EXXON CORPORATION, EXXON SHIPPING COMPANY, and EXXON PIPELINE COMPANY, *et al., in personam,* and the T/V EXXON VALDEZ, *in rem,*<br><br>        Defendants. | No. 3:91-cv-0082 Civil (HRH) |

## DEFENDANT EXXON MOBIL CORPORATION, ET AL.'S REPLY IN SUPPORT OF ITS MOTION TO ENFORCE THE CONSENT DECREE

## I.    __INTRODUCTION__

The only issue presented by Exxon Mobil Corporation, et al.'s Motion to Enforce the

Consent Decree ("Motion") is whether the 1991 Agreement and Consent Decree ("Consent

Decree") precludes the United States and the State of Alaska (the "Governments") from

demanding additional funds for clean-up pursuant to the Reopener for Unknown Injury (the

"Reopener").   (Consent Decree, Docket No. 369, Ex. A at ¶¶ 17-19.)  In their Oppositions, the

Governments do not dispute that their 2006 Reopener Submission and demand for payment

propose nothing beyond investigating the potential for conducting further clean-up (*i.e.*, the

removal of remaining oil residues).  Because the Consent Decree released Exxon Mobil

Corporation, et al. (collectively, "Exxon") from obligations to conduct further "clean-up," and the

parties explicitly limited the scope of the Reopener to "restoration projects," the Court may enter

an order that any attempt to base a Reopener claim on a clean-up plan violates the Consent

Decree.

The Governments' assertion that Exxon has no presently enforceable right to seek relief

from the Court further dooms their Reopener Submission.  If the Governments contend that their

2006 Reopener Submission and demand for payment created no enforceable obligations, then

Exxon's motion may be dismissed, not because it is premature, but because it is moot.  The time

for a claim under the Reopener has expired, so a demand made today, five years after the

deadline, would be invalid.  On the other hand, if the Governments contend that their 2006

demand is legally enforceable, then this Court may dispose of a current existing controversy even

in the absence of an enforcement action.  That the Governments intend to conduct additional

research before initiating such an action is not grounds to postpone judicial review of the present

controversy.  None of this additional research would be admissible in an action to enforce their 2006 demand since under paragraph 19 of the Consent Decree, the Governments' demand stands or falls on the basis of the information provided with the demand in 2006.

This Motion involves a straightforward interpretation of the provisions of the Consent Decree unrelated to the merits of the Governments' 2006 Reopener Submission.  The Governments' contention that the narrowly confined Reopener provision may be read to impose liability upon Exxon for new clean-up work is overbroad and inconsistent with the plain language of the Consent Decree.  Rather, the Consent Decree makes clear that the parties limited the Reopener to "restoration projects," that "restoration" is something separate from and in addition to "clean-up," and that entry of the Consent Decree ended Exxon's further obligations for "clean-up" once and for all.  This is the only interpretation of these provisions consistent with the plain language and construction of the Consent Decree—a settlement, executed 20 years ago, providing for the conclusion of clean-up efforts, but contemplating restoration activities continuing into the future.  And the Governments plainly understood that "clean-up" is something other than "restoration" because they reimbursed Exxon nearly $40 million for clean-up costs incurred by Exxon after the effective date of the  Consent Decree.  As such, any attempt to base a Reopener claim on a clean-up plan violates the Consent Decree.[1]

---

[1] As noted in this Court's March 7, 2011 Order, the Agreement and Consent Decree at issue was filed and approved by the Court in both the environmental litigation commenced by the United States in this case, No. 3:91-cv-0082, and by the State of Alaska in No. 3:91-cv-0083.  (March 7, 2011 Order, Docket No. 362 at p. 1, n.2.)  Exxon's original Motion to Enforce the Consent Decree inadvertently contained only the caption No. 3:91-cv-0082-HRH.  The Motion was directed toward and referenced both the United States of America and the State of Alaska and was served on both parties.  To remove any doubt, Exxon filed an identical Motion to Enforce the Consent Decree in the case brought by the State of Alaska, No. 3:91-cv-0083, on September 13, 2011.  (Motion to Enforce the Consent Decree, Docket No. 309.)  On September 26, 2011, the

(continued...)

Exxon's Reply in Support of Motion to Enforce Consent Decree
*USA v. Exxon Corporation, et al.* Case No. 3:91-cv-0082-HRH
Page 3

## II.   ARGUMENT

### A.   Judicial Review of Exxon's Motion is Appropriate at this Time.

**1.   If the 2006 Reopener Submission and Demand for Payment Created No Enforceable Obligation, Then the Time for a Claim Under the Reopener has Expired.**

In their Oppositions, the Governments argue that Exxon's Motion is premature under the terms of the Consent Decree because the Governments have not yet sought to enforce a demand under the Reopener. They assert that the Consent Decree vests the Governments with the exclusive right to enforce the Reopener, and that it has not elected to do so. While this Court noted that "[t]he possible reopener claim belongs to the Governments" (March 7, 2011 Order at p. 4), such a claim was subject to specific deadlines set forth in the Consent Decree. The Reopener required the Governments to provide Exxon with detailed plans for all proposed "restoration projects," together with all amounts claimed and all information relied upon in preparing the restoration plan, by June 2, 2006, followed by a specific demand for payment by September 1, 2006. (Consent Decree at ¶¶ 17 & 19.) If the Government's 2006 demand to Exxon in 2006 did not create an enforceable obligation, then it is too late for the Governments to do so now. And Exxon's Motion can be granted on mootness grounds because the time for making a claim under the Reopener has expired.

**2.   The Court Retained Jurisdiction to Interpret the Consent Decree and Ripeness Considerations Do Not Foreclose Judicial Review.**

---

(...continued)
State of Alaska filed an Opposition to Exxon's Motion in Case No. 3:91-cv-0083. (State's Opp., Docket No. 313.) The State of Alaska's Opposition is nearly identical to the United States' Opposition filed in Case No. 3:91-cv-0082 on September 9, 2011. (U.S.'s Opp., Docket No. 373.)

EXXON'S REPLY IN SUPPORT OF MOTION TO ENFORCE CONSENT DECREE
*USA v. Exxon Corporation, et al.* Case No. 3:91-cv-0082-HRH
Page 4

The Governments cannot seriously argue that the Court lacks jurisdiction to resolve a dispute concerning the scope of Exxon's potential obligations.  The Court expressly retained jurisdiction to make such orders as are necessary "for the *construction*, implementation, or enforcement of" the Consent Decree.[2]  Instead, the Governments argue that certain "ripeness considerations" *suggest* that Exxon's Motion is premature.  But nowhere in their Oppositions do the Governments state that the issue raised by Exxon's Motion is not ripe for review.  Nor do the Governments assert that application of the ripeness doctrine is proper here.[3]  Rather, the Governments simply ask that this Court look to some "ripeness considerations" and "by analogy" deny Exxon's Motion as premature.  Even if the Court concludes that the ripeness doctrine is

---

[2] Specifically, paragraph 38 of the Consent Decree states: "[t]he Court shall retain jurisdiction of this matter for the purpose of entering *such further orders*, direction, or relief as may be appropriate for the *construction*, implementation, or enforcement of this Agreement" (emphasis added).  Exxon's Motion asks this Court to determine whether the Consent Decree precludes the Governments from demanding additional funds for "clean-up" pursuant to the Reopener, requiring the Court to construct and interpret the Consent Decree.  As such, the subject matter of Exxon's Motion falls plainly within the jurisdiction retained by this Court.

[3] None of the cases relied upon by the Governments stands for the proposition that "ripeness considerations" are proper where a court has retained jurisdiction over an action for the express purpose of resolving disputes such as the one raised by Exxon's Motion.  Instead, the Governments largely rely upon inapposite cases in which a plaintiff's original claim was brought before sufficient facts had developed to enable the court to adjudicate the merits of its claims and/or before the occurrence of events upon which the resolution of the plaintiff's claim rests. *See e.g.*, *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 731 & 734 (1998); *Texas v. United States*, 523 U.S. 296, 299 & 300 (1998); *Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 773 & 780-82 (9th Cir. 2000); *Friends of Potter Marsh v. Peters*, 371 F.Supp.2d 1115, 1118 & 1125-26 (D. Alaska May 27, 2005).  In contrast, this Court has retained jurisdiction over this matter for the express purpose of enforcing and interpreting the Consent Decree.  Exxon's pending Motion does not implicate the justiciability of the underlying causes of action asserted by the Governments in their complaints against Exxon, nor has Exxon asserted a claim against the Governments.  This motion does not turn on factual evidence that may or may not help the Governments decide whether they will attempt to enforce their 2006 demand for payment.  Rather, it turns on whether the Reopener Submission itself, submitted in 2006, failed to comply with the terms of the Consent Decree.  Accordingly, this Motion presents a live dispute with respect to the meaning of key terms in the Consent Decree, a matter over which this Court has expressly retained jurisdiction.  (Consent Decree at ¶ 38.)

Exxon's Reply in Support of Motion to Enforce Consent Decree
*USA v. Exxon Corporation, et al.* Case No. 3:91-cv-0082-HRH
Page 5

applicable, the "ripeness considerations" raised by the Governments do not warrant postponing review.

Specifically, the Governments rely on the "ripeness considerations" set forth in *Abbott Labs. v. Gardner*—whether the issue is fit for review and whether the proponent of the claim will suffer hardship if the court foregoes review. 387 U.S. 136, 149 (1967), overruled on other grounds by *Califano v. Sanders*, 430 U.S. 99 (1977). Neither of these considerations warrants postponing review of Exxon's Motion. The issue here is definite, concrete, and fit for judicial decision, and failure to decide it would result in hardship to Exxon. The basic rationale for the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs.*, 387 U.S. at 148. Far from abstract, the controversy raised in this Motion is straightforward and concrete: Is the attempt to base a Reopener claim on a clean-up plan in violation of the Consent Decree?

> **a.   Further Factual Development is Unwarranted, Will Not Enhance this Court's Review, and Violates the Terms of the Reopener Provision.**

First, the Governments contend that the Court should forego review because the Court's review would benefit from further factual development and refinement of the Governments' Reopener Submission. In the ripeness context, a claim is "fit" for review if the issues raised are primarily legal, the issues do not require further factual development, and the challenged action is final. *Trustees for Alaska v. Hodel*, 806 F.2d 1378, 1381 (9th Cir. 1986) (citation omitted).

Here, further factual development and refinement of the Governments' Reopener Submission is unnecessary, will not enhance this Court's judicial review, and violates the terms of

Exxon's Reply in Support of Motion to Enforce Consent Decree
*USA v. Exxon Corporation, et al.* Case No. 3:91-cv-0082-HRH
Page 6

the Reopener provision.[4]  At issue is whether the Governments may demand additional funding

for clean-up under the Reopener, which limits Exxon's potential liability for additional funding to

"restoration projects."  The Court need only examine its already-entered Consent Decree to

determine that the Governments' proposed clean-up does not qualify as a "restoration project"

under the Reopener.  There are no uncertain or contingent events that will alter this result.  This

inquiry will not benefit from further factual development or refinement of the Governments'

Reopener Submission, as this is an issue of contract interpretation that turns on the plain language

of the Consent Decree and the parties' understanding of "clean-up" and "restoration" at the time

the Consent Decree was executed.  *See Yahoo! Inc. v. La Ligue Contre Le Racisme*, 433 F.3d

1199, 1212 (9th Cir. 2006) ("If the legal question is straightforward, relatively little factual

development may be necessary.").[5]

---

[4] The Governments, of course, can continue their factual development in order to determine whether Trustee Council funds should be used to conduct additional clean-up or other projects. As this Court recognized in its March 7, 2011 Order, "significant funds will remain to carry out remediation projects, if deemed appropriate, irrespective of whether ExxonMobil is or is not liable to the Governments under the reopener provision." (March 7, 2011 Order at p. 2.)  In fact, as of August 31, 2011, the  Trustee Council had more than $175 million remaining in three investment fund accounts although some of those funds are currently under contract. (Declaration of Carla J. Christofferson in Support of Reply in Support of Motion to Enforce the Consent Decree ("Christofferson Decl."), Ex. A at p. 1.)

[5] Furthermore, the Reopener forecloses further factual development and refinement of the Governments' Reopener Submission.  Under the terms of the Reopener, the Governments were required to "submit a detailed plan for all such restoration projects" 90 days before making a demand for payment.  (Consent Decree at ¶ 19.)  The Governments' deadline for submitting a plan was June 2, 2006.  (Because the Governments demanded payment pursuant to the Reopener on August 31, 2006, they were required to submit a plan no later than June 2, 2006.  (Consent Decree at ¶ 19.)  Any substantive review of the Governments' Reopener Submission must be limited to a review of their May 31, 2006 Submission, as any plan or supplement to the Governments' Submission submitted after June 2, 2006 fails to comply with a central requirement of the Reopener, specifically that "detailed plans for all such restoration projects" be submitted 90 days before making any demand for payment.  In short, the Governments' Reopener Submission stands or falls on the basis of the information provided in the Governments' May 31, 2006

(continued...)

**b.      Exxon Will Suffer Hardship Should the Court Forego Review.**

The Governments incorrectly assert that Exxon would not suffer "significant hardship" should the Court forego judicial review.  *See Abbott Labs.*, 387 U.S. at 149.  This "ripeness consideration" also tilts against further delay.  As an initial matter, consideration of hardship is "largely irrelevant in cases, such as this one, in which neither the agency nor the court have a significant interest in postponing review."  *Elec. Power Supply Ass'n v. FERC*, 391 F.3d 1255, 1263 (D.C. Cir. 2004).  Here, there is no valid reason to postpone review because, as noted earlier, the Governments' pending studies and proposed refinement of the Reopener Submission have no bearing on the issues of contract interpretation presented in this Motion.  In contrast, Exxon has a significant interest in the resolution of its Motion now, and delay will just force Exxon to relitigate these issues at a future date.  *See City of Auburn v. Quest Corp.*, 260 F.3d 1160, 1173 (9th Cir. 2001) ("Were we to decline to hear the case on grounds of ripeness, plaintiff would be forced to…return to court to argue…exactly the same argument that makes here."), overruled on other grounds in *Sprint v. Telephony PCS, L.P. v. County of San Diego*, 543. F.3d 571 (9th Cir. 2008).

In any event, Exxon will suffer hardship if the decision on this Motion is delayed.  In the ripeness context, a party may make a showing of hardship if it is subjected to civil or criminal liability.  *Ohio Forestry*, 523 U.S. at 733.  Since August 31, 2006, when the Governments demanded that Exxon pay $92 million dollars pursuant to the Reopener, Exxon has been subject

_____

(…continued)
Submission, and the Governments are not entitled to further factual development of their Reopener Submission.

to possible civil liability.  (August 31, 2006 Demand Letter, Docket No. 369, Ex. D.)  Threats of liability are sufficient to establish harm under the ripeness doctrine.  *See Basic Research, LLC v. FTC*, 2011 WL 1989772 (D. Utah May 23, 2011).  In *Basic Research*, for example, a party threatened with civil penalties and possible contempt for violation of an FTC order brought an action asking a court to interpret the meaning of a disputed provision of the order.  *Id.*, at *2 & 5-6.  The Court found the claim to be ripe, as postponing review would force plaintiff to spend time and resources unnecessarily or endure the risk of sanctions.  *Id.*, at *9.  Should the Court decline to rule on this Motion, Exxon, like the plaintiff in *Basic Research*, must continue to expend substantial time and resources to maintain its ability to defend against the Governments' long-pending claim.  (Christofferson Decl. at ¶ 6.)

The Governments also contend that Exxon will not suffer "significant hardship" if it endures further delay because more than five years have passed since the Governments first served their Reopener Submission.[6]  But this just reinforces the need for judicial review now. The Reopener subjected Exxon to additional potential liability for a limited period of time— through September 1, 2006.  Though that window closed five years ago, the Governments' Reopener Submission remains unresolved.  The Governments alone should not be able to control the onset of judicial proceedings and thereby force Exxon to endure $100 million in potential liability with no means of bringing it to resolution.

---

[6] The five-year hiatus stemmed from a tolling agreement the parties entered into for purposes of facilitating discussions and the mutual exchange of scientific data between the parties with respect to the Governments' Reopener Submission.  (Christofferson Decl. at ¶ 3.)  This tolling agreement remained in place until a little over a year ago when Exxon exercised its right to terminate the agreement.  (*Id.*, Ex. B at p. 3.)  Exxon ultimately terminated the tolling agreement when the Governments frustrated Exxon's efforts to examine studies pertaining to the Reopener claim, evidencing their unwillingness to engage in good-faith negotiations.  (*Id.* at ¶ 5.)

**B.     The Consent Decree Imposes No Further Obligations upon Exxon to Fund Additional Clean-Up Efforts.**

**1.     The Consent Decree Limits Exxon's Potential Liability Under the Reopener to "Restoration Projects."**

The Governments incorrectly assert that Exxon asks this Court to import a "clean-up exception" into the Reopener.  This is unnecessary, as interpreting the Consent Decree within its four corners sufficiently demonstrates that Exxon *and* the Governments limited Exxon's potential liability for additional funding to "restoration projects."[7]  As detailed in Exxon's Motion, "clean-up" and "restoration projects" are used to describe different responses to the Spill throughout the Consent Decree.  (*See* Mot. at p. 11.)  These terms are not used interchangeably, and no language in the Consent Decree supports the Governments' argument that "clean-up" is a subset of "restoration."

Noticeably absent from the Reopener provision is any mention of "clean-up."  Where parties to a contract expressly use one term in certain provisions, but exclude it from others, courts assume that the omission is intentional and will not read the term into the latter provisions. *See United States v. Armour*, 402 U.S. 673, 680 (1971) (applying this same principle of construction and refusing to import a "successors and assigns" clause into one paragraph of the consent decree where other paragraphs included said clause, thus evidencing the parties' intent to exclude the "successors and assigns" clause from the paragraph at issue).  Thus, the absence of "clean-up" from the Reopener provision evidences the parties' intent to exclude clean-up from the

---

[7] The plain language of the Consent Decree evidences that the parties limited the Reopener to "restoration projects," and plainly excluded "clean-up" from its purview.  In relevant part, the Reopener states, "Exxon shall pay to the Governments such additional sums as are required for the performance of *restoration projects* in Prince William Sound and other areas affected by the Oil Spill . . . ."  (Consent Decree at ¶ 17 (emphasis added).)

Exxon's Reply in Support of Motion to Enforce Consent Decree
*USA v. Exxon Corporation, et al.* Case No. 3:91-cv-0082-HRH
Page 10

type of projects the Governments might require Exxon to fund under the terms of the Reopener provision.

That "restoration projects" under the Reopener do not encompass plans to conduct further clean-up is further supported by paragraph 11(b) of the Consent Decree, which unequivocally ends Exxon's financial obligations for "clean-up."[8]  Reading the Reopener in light of paragraph 11(b) the Court should conclude that the parties intended to end Exxon's financial obligations for "clean-up" once and for all, and that this intention was carried out in the Reopener by excluding "clean-up" from the purview of the Reopener and limiting Exxon's potential liability for additional funding to "restoration projects."

> ### 2.   Extrinsic Evidence Does Not Support the Governments' Current Claim that "Restoration Projects" May Encompass "Clean-up."

Finding no support for their position under the terms of the Reopener, the Governments ask the Court to apply definitions of "restoration" set forth in *Webster's Third Dictionary* and the implementing regulations of Section 311(f) of the Clean Water Act, 33 U.S.C. § 1321(f).  These definitions are not helpful, as they do not support the Governments' contention that the parties understood "restoration" to encompass "clean-up."

Rather, the definition derived from the implementing regulations of the Clean Water Act fully supports Exxon's contention that "restoration" is conduct different than and in addition to "clean-up."  In relevant part, 43 C.F.R. § 11.14(11) (1986 ed.) defines "restoration" as actions undertaken "*in addition to* response actions."  (U.S's Opp. at p. 15 (emphasis added); State's Opp. at p. 16 (emphasis added).)  In their Oppositions the Governments seemingly acknowledge

---

[8] Paragraph 11(b) states that "[u]pon Final Approval [of the Consent Decree], Exxon shall have no further obligations with respect to clean-up . . ."

Exxon's Reply in Support of Motion to Enforce Consent Decree
*USA v. Exxon Corporation, et al.* Case No. 3:91-cv-0082-HRH
Page 11

that "restoration" encompasses activities above and beyond clean-up operations: "Clearly, restoration actions were intended to supplement actions taken during response." (*Id.*)  This definition does not support the Governments' assertion that "restoration" may permissibly include "clean-up."  In fact, the Governments' analysis supports what Exxon has asserted all along— "restoration" encompasses actions different than and in addition to "clean-up."

In addition, the definition of "restoration" derived from *Webster's Dictionary* fails to substantiate the Governments' assertion that "restoration" may encompass further "clean-up." This Court need not reference common usage where the Governments have agreed upon a definition of "restoration" that comports with the construction of the Consent Decree.

To the extent the Court considers *any* document outside the Consent Decree to determine the intended scope of "restoration projects," the Court need look no further than the Memorandum of Agreement and Consent Decree ("MOA") executed by the Governments and entered by this Court in *United States v. State of Alaska*, No. A91-081 CV.  (Christofferson Decl., Ex. C.)  The MOA was explicitly incorporated by reference into the Consent Decree at paragraph 10. [9]  As such, it is a proper aid to construction of the Consent Decree.  *See United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238 (1975) (stating that documents incorporated by reference are proper aids to the construction of consent orders).  At § II.K, the MOA defines "restoration" as follows:

---

[9] Paragraph 10 of the Consent Decree states, in relevant part: "The Governments represent that the monies paid by Exxon to the Governments pursuant to this Agreement will be allocated, received, held, and used in accordance with the Memorandum of Agreement and Consent Decree between the United States and the States of Alaska ('MOA'), which this Court entered on August 28, 1991 . . ."

. . . any action, *in addition to response and cleanup activities*, required or authorized by state or federal law, which endeavors to restore to their pre-spill condition any natural resource injured, lost, or destroyed as a result of the Oil Spill and the services provided by that resource or which replaces or substitutes for the injured, lost or destroyed resource and affected services.  Restoration includes all phases of injury assessment, restoration, replacement, and enhancement of natural resources, and acquisition of equivalent resources and services.

(*Id.* at p. 14 (emphasis added).)  The definition in the MOA indicates that the parties viewed "restoration projects" to refer to activities above and beyond clean-up activities.  Because the MOA was incorporated by reference into the Consent Decree, the Court may apply this definition in interpreting the Reopener provision and correctly conclude that any attempt to base a Reopener claim on a clean-up plan violates the Consent Decree.

Finally, the parties' common understanding that Exxon was to have no further liability for clean-up (and, therefore, that a restoration plan under the Reopener cannot include clean-up) is evidenced by the parties' actions after the Consent Decree was entered.  The Governments agreed that Exxon would have no further financial obligations with regard to clean-up upon Final Approval of the Consent Decree.[10]  As a result, Exxon was reimbursed for all clean-up work conducted after the Effective Date of the Consent Decree, for a total of almost $40 million.  (Christofferson Decl., Ex. D at pp. 1 & 3.)  It is nonsensical to suggest that the Governments can

---

[10] Paragraph 11(b) of the Consent Decree states, in relevant part, "Upon Final Approval, Exxon *shall have no further obligations with respect to clean-up* except as set forth in this Agreement and in addition Exxon shall be entitled to a credit, to be applied to the next payment due from

(continued...)

now seek clean-up costs from Exxon when Exxon has already been reimbursed by the Governments for those very same type of costs.

### 3. The "Notwithstanding" Clause is Irrelevant as it Cannot Override the Reopener, Which is Plainly Limited to "Restoration Projects."

The Governments place a great deal of unwarranted significance on the "notwithstanding" clause that introduces the Reopener and argue that this language "overrides" all other provisions of the Consent Decree. (Consent Decree at ¶ 17.) The Governments' reliance on this clause is misguided, as the "notwithstanding" clause is wholly irrelevant to this dispute. Although the "notwithstanding" clause may override other provisions of the Consent Decree, it does not override the plain language of the Reopener itself, which limits Exxon's potential liability to "restoration projects."

### C. The Governments Concede that "Clean-up" Entails Locating and Removing Oil, and that the Reopener Submission is No More than a Plan to Locate and Remove Oil.

What is most striking about the Governments' Oppositions is what they don't refute. Nowhere in the Governments' Oppositions do the Governments assert that the actions taken by Exxon, at the direction of the Federal and State On-Scene Coordinators, from the Effective Date of the Consent Decree until June 1992 (when the clean-up was declared complete) constitute anything but "clean-up." During that period of time, Exxon identified shorelines that required treatment and removal of oil deposits, and removed oil through the use of hand tools, mechanical equipment, tilling and raking, and the application of bioremediation technologies. (Mot. at pp.7-8.) The Governments' failure to refute Exxon's characterization of these actions as clean-up

---

(...continued)
Exxon to the Governments, as provided in subparagraph 8(b), for all Expenditures incurred by
(continued...)

concedes that the parties to the Consent Decree understood that "clean-up" meant the removal of oil.

This concession is particularly important in light of the Governments' failure to refute Exxon's characterization of the Reopener Submission as nothing more than a proposal to locate and remove lingering oil.  Rather than contest this characterization of their Reopener Submission, the Governments contend that "restoration" may encompass "clean-up" techniques.  Thus, the viability of the Governments' Reopener Submission hinges upon whether the parties understood "restoration" to encompass "clean-up."  And if "restoration" does not encompass "clean-up," the Governments' Reopener Submission must fail.  As described more fully above, the plain language and construction of the Consent Decree, the Governments' own definition of "restoration" set forth in the MOA, and the parties' conduct, foreclose this understanding of "restoration" and illustrate that "restoration" encompasses conduct different than and "*in addition to* . . . cleanup." (Christofferson Decl., Ex. C at pp. 7 & 8 (emphasis added).)  The Governments, therefore, are precluded from demanding additional funds for "clean-up" under the Reopener.

## III.    <u>CONCLUSION</u>

For the foregoing reasons and the reasons set forth in Exxon's initial moving papers, Exxon requests that the Court grant Exxon's Motion to Enforce the Consent Decree and issue an order confirming that the Consent Decree discharges Exxon's financial obligations with respect to clean-up and declaring that any attempt by the Governments to extract sums of money from

---

(...continued)
Exxon for clean-up work [conducted] pursuant to . . . subparagraph 11(a)" (emphasis added).

Exxon by basing a Reopener claim on a clean-up plan constitutes a violation of the Consent Decree.

Respectfully submitted this 30th day of September 2011.

s/ Douglas J. Serdahely
PATTON BOGGS LLP

Attorneys for Defendant Exxon Shipping Company


s/ John F. Clough, III (consent)
CLOUGH & ASSOCIATES PC

Attorneys for Defendant Exxon Corporation

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 30th day of September 2011, a copy of the foregoing document was served by the Court's Electronic Case Management system upon all persons registered to receive filings in this matter, including:

    Erika M. Zimmerman
    Trial Attorney, Oregon No. 05504
    Environmental Enforcement Section
    United States Department of Justice
    Email:  Erika.zimmerman@usdoj.gov

By:   s/Douglas J. Serdahely

    PATTON BOGGS LLP